UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

DELORES MIGDAL,

       Plaintiff,

       v.                                          Case No. 05-CV-455

AURORA HEALTH CARE, INC.,

       Defendant.
_____

**ORDER**

On April 21, 2005, plaintiff Delores Migdal ("Migdal") filed her complaint in this action alleging that the defendant, Aurora Health Care, Inc. ("Aurora"), acting through its independent claims administrator, Matrix Absence Management, Inc. ("Matrix") improperly denied Migdal long-term disability benefits. Under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, Migdal seeks judicial review of the defendant's determination that Migdal was not eligible for long-term disability benefits. Aurora filed a motion for summary judgment on March 2, 2006. For the reasons stated below, the court will grant Aurora's motion for summary judgment.

**BACKGROUND**

The material facts of this case are not in dispute. Migdal worked for Aurora as a sales client assistant until August of 2001. Aurora maintains a long-term disability plan that provides current and former employees with disability benefits in the event that they become disabled. Under the plan, "disability" is defined in two ways, depending on the amount of time the employee receives benefits:

> You are considered disabled if by reason of illness, injury, accident or infectious disease you are not able to perform the material duties of your regular job. After 24 months of LTD [Long-Term Disability] payments, benefits can continue if you cannot perform any occupation for which you are suited by education, training or experience.

(Flynn-McBride Aff. Ex. 1, 6.)

The standard for granting benefits during the first 24 months of disability is commonly referred to as the "own occupation" provision and the standard thereafter is referred to as the "any occupation" provision. The disability plan grants the plan administrator discretionary authority to determine eligibility for benefits: "The plan administrator has full discretionary authority to make decisions on eligibility for benefits under this plan and construe the terms of the plan for this purpose, and will do so without regard to any possible conflicting interests of Aurora Health Care, Inc." (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 4; Flynn-McBride Aff. Ex. 1, 17.)

In the event benefits are denied, the plan sets forth a procedure for appeal, which allows claimants two levels of review of an initial denial of benefits and affords claimants the opportunity to submit any additional information that they feel supports their claim.

Migdal was determined to be disabled under the plan's "own occupation" provision as of August 21, 2001. She received disability benefits under the "own occupation" provision from November 19, 2001 to February 29, 2004. The process of determining whether Migdal would qualify for disability benefits under the "any occupation" provision began in May 2003, when Matrix notified Migdal that it was

beginning to review the documentation in its file, including medical and vocational records collected while Migdal received benefits under the "own occupation" provision. Matrix reviewed medical records from Migdal's treating physicians and requested that Migdal undergo an Independent Medical Examination ("IME") with Dr. Dennis Brown, a Milwaukee physician who is board certified in surgery and rehabilitation. (DPFOF ¶ 12; Flynn-McBride Aff. ¶ 7.)

Dr. Brown completed his examination in February 2004. In the course of conducting the IME, Dr. Brown reviewed Migdal's medical and vocational records, including Migdal's complete medical files from Daniel Rosler, MD; Brian Dudor, MD; St. Luke's Medical Center; Daniel Suberviola; Hales Corners Open MRI; Community Memorial Medical Center; and Syed Hussaini, MD. (DPFOF ¶ 14; Flynn-McBride Aff. Ex. 2.) Dr. Brown also interviewed Migdal, and undertook his own physical examination of her. The physical examination of Migdal took no more than five minutes. (Migdal Aff. ¶ 9.) After completing the IME, Dr. Brown concluded: "Ms. Migdal is not completely disabled from any occupation. Her self-reported severe disability is not supported by diagnostic tests, an October 2002 functional capacity examination, or this IME . . . . Ms. Migdal is able to work on a full-time basis." (DPFOF ¶ 15; Flynn-McBride Aff. Ex. 2.)

On March 18, 2004, Matrix denied Migdal's claim for long-term disability benefits under the "any occupation" provision of the plan. On the basis of Dr. Brown's IME and the IME's incorporation of Migdal's treating physicians' records,

Matrix concluded that Migdal was "not disabled from performing any occupation." (DPFOF ¶ 16; Flynn-McBride Aff. ¶¶ 8, 9; Ex. 3.)

Migdal appealed the initial denial of benefits on March 19, 2004. Migdal supplemented her appeal with a May 6, 2004 MRI exam and summary letters from Doctors Suberviola and Rosler. The summary letters stated that Migdal was totally and permanently disabled. (DPFOF ¶ 19; Crowe Aff. ¶ 4.) After reviewing the additional evidence submitted, as well as all of Migdal's other medical records and Dr. Brown's IME, Laura Crowe ("Crowe"), a Matrix Integrated Benefits Manager, denied Migdal's appeal in a letter dated September 24, 2004. (Crowe Aff. Ex. 5.) Crowe noted that Migdal's laboratory tests were unchanged since 2000, and her MRI was essentially unchanged since 2002. (*Id*.) Crowe also noted that the summary letters from Migdal's physicians lacked supporting objective medical evidence. (*Id*.)

Migdal appealed the second denial on October 6, 2004. Migdal did not submit any new information with this second appeal, but sent Matrix certified copies of medical records that had been submitted earlier in uncertified form, as well as one bill for MRI services. Marc Della Costa ("Della Costa"), one of Matrix's Integrated Claims Supervisors, reviewed the following items in connection with Migdal's second appeal: (1) Migdal's appeal letter; (2) the two prior denial letters; (3) Dr. Brown's IME; (4) the claims file, which included the medical records of Migdal's treating physicians; (5) the certified medical records and bill submitted by Migdal; and (6) medical websites. (DPFOF ¶ 22; Della Costa Dep. Ex. 6.) Substantially relying on Dr. Brown's IME, Della Costa found that the medical evidence was "not consistent

with someone having a disabling condition preventing work in any occupation, in particular jobs sedentary in nature." (Della Costa Dep. Ex. 6.) Following the denial of her second appeal, Migdal filed the instant suit on April 4, 2005.

**ANALYSIS**

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Celotex*, 477 U.S. at 331

Migdal's complaint contains 2 counts. First, Migdal claims that Aurora breached its contractual and fiduciary duties under ERISA to Migdal by refusing to pay long-term disability benefits to her. Second, Migdal seeks a declaration that she is entitled to recover long-term disability benefits under the plan.

ERISA applies to "any plan, fund or program established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . . " 29 U.S.C. § 1002(1). The Act was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal quotation marks and citations omitted).

Migdal does not cite to any particular provision of ERISA in her claim that Aurora breached a contractual and fiduciary duty. Aurora presumes that the claim arises under ERISA § 502(a)(2); 29 U.S.C. § 1132(a)(2), which pertains to breaches of a plan administrator's fiduciary duty to the plan's beneficiaries. Aurora asserts that this section only applies to plaintiffs seeking recovery for the plan as a whole, not to an individual beneficiary. In support of this position, Aurora notes that the language of the statute refers to recovery to the plan, not an individual.

Section 1132(a)(2) provides that "a civil action may be brought by . . . a participant . . . for appropriate relief under section 1109." And § 1109 provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good *to such plan* any losses to the plan resulting from each such breach, and to restore *to such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .

-6-
Case 2:05-cv-00455-JPS   Filed 10/05/06   Page 6 of 15   Document 31

29 U.S.C. § 1109 (emphasis added). Additionally, relevant case law dictates that recovery under § 1109 must go to the plan as a whole, not the individual beneficiary. *See, e.g., Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985); *Magin v. Monsanto Co.*, 420 F.3d 679, 687 (7th Cir. 2005).

Given that Migdal does not seek recovery for the plan as a whole, the court concludes that she cannot seek damages under ERISA § 502(a)(2); 29 U.S.C. § 1132(a)(2). Accordingly, Migdal's claim that Aurora breached its contractual and fiduciary duties under ERISA will be dismissed because Migdal fails to establish that she has a right to recovery under ERISA for the alleged breach. However, the substance of Migdal's first claim, that Aurora improperly denied her long-term disability benefits, and the second count in her complaint seeking a declaration that she is entitled to recover long-term disability benefits under the plan, are permissible claims under ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B). Specifically, this section of the statute pertains to a plaintiff seeking "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Thus, Migdal's complaint raises a cognizable claim under this section of ERISA.

ERISA requires that plan procedures afford claimants a reasonable opportunity for "a full and fair review" of dispositions adverse to the claimant. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-31 (2003); 29 U.S.C. § 1133(2). If a plan gives the administrator discretionary authority to determine eligibility for

-7-
Case 2:05-cv-00455-JPS   Filed 10/05/06   Page 7 of 15   Document 31

benefits, the administrator's decision is to be reviewed under the deferential arbitrary and capricious standard. *Firestone Tire & Rubber Co.*, 489 U.S. at 115; *Hackett v. Xerox Corp.*, 315 F.3d 771, 773 (7th Cir. 2003).

Here, Aurora's Long-Term Disability Plan gives the plan's administrator, Matrix, discretionary authority to determine eligibility for benefits. The plan specifically states: "[t]he plan administrator has full discretionary authority to make decisions on eligibility for benefits under this plan and construe the terms of the plan for this purpose, and will do so without regard to any possible conflicting interests of Aurora Health Care, Inc." (Flynn-McBride Aff. Ex. 1, 17.) Accordingly, the court will review the plan administrator's decision under the arbitrary and capricious standard of review.

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan. *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996). Under this standard, the court will uphold Aurora's denial of benefits so long as that decision has "rational support in the record." *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Davis v. Unum Life Ins. Co.*, 444 F.3d 569, 576 (7th Cir. 2006) (quoting *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005)).

Migdal raises several arguments in an effort to show that Matrix's decision lacks rational support in the record. Migdal contends that the Seventh Circuit requires a plan administrator to perform a "reasonable inquiry" into the insured's claim for disability benefits and that a "reasonable inquiry" includes the hiring of vocational and medical experts to conduct a complete and thorough analysis. (Pl.'s Resp. Br. 7.) Migdal asserts that Matrix did not conduct a sufficient inquiry into her claim because: (1) no vocational assessment was completed to determine Migdal's functional capacity; (2) one of Matrix's claims administrator, Della Costa, did not have an education or work background in vocational assessment; (3) Matrix credited Dr. Brown's IME over the opinions of Migdal's own treating physicians; (4) Dr. Brown's physical examination of Migdal lasted "no more than five minutes" (Migdal Aff. ¶ 9); and (5) Matrix failed to determine whether there existed a conflict in interest that prevented Dr. Brown from fairly evaluating Migdal's medical condition.

In support of her claim that Matrix was required to perform a vocational assessment in the course of conducting a reasonable inquiry into her claim, Migdal cites to *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472 (7th Cir. 1998). In *Quinn*, the Seventh Circuit held that while the administrator was "under no obligation to undergo a full-blown vocational evaluation" of the claimant's job, the administrator was "under a duty to make a reasonable inquiry into the types of skills [the claimant] possesses and whether those skills may be used at another job that can pay her the same salary range as her job with HCSC." *Id.* at 476. Under this holding, Migdal asserts, Matrix was required to perform a vocational assessment in the course of

conducting a reasonable inquiry into her claim. The circumstances in *Quinn*, however, substantially differ from those of this case.

Under the disability plan in *Quinn*, a claimant was considered disabled when the claimant was: "wholly prevented, by reason of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred." *Quinn*, 161 F.3d at 474. Thus, in determining whether the claimant qualified for long-term disability benefits, the administrator had to determine whether the claimant was capable of performing another job with a salary level similar to his or her current job. *Id.* at 476. The court held that the plan administrator impermissibly concluded that there were thousands of jobs in the local economy that the claimant could perform, even though the administrator did not know what the claimant's job duties entailed, what skills, training, and experience the claimant possessed, or what the claimant's exertional requirements were. *Id.* The court held that the administrator's decision needed to be based on more than "her opinion on her knowledge of the Chicago job market and her notion of what skills are required for a clerical position." *Id.* Rather, under the plan, a vocational assessment was needed to determine whether the claimant could find work "comparable to that in which he was engaged for the Employer." *Id.*

In the instant case, Matrix's decision was not solely based on the administrator's opinion and knowledge. The decision was based on the IME conducted by Dr. Brown, the medical records of Migdal's treating physicians, and Migdal's claims file. (Crowe Aff. ¶¶ 4-7; Flynn-McBride Aff. ¶ 9; Della Costa

Dep. 33.) Additionally, in *Quinn*, no doctor's opinion stated whether there were any limitations in the claimant's ability to work. 161 F.3d at 476. Here, Dr. Brown assigned work restrictions, and during the course of conducting the IME, he took into account work restrictions assigned by Migdal's treating physicians. (Flynn-McBride Aff. Ex. 2; Pl.'s Resp. Br. 9-10.) Moreover, the court does not read *Quinn* to establish a blanket requirement that plan administrators must obtain independent vocational expert analysis in order to provide "a full and fair review" of dispositions adverse to the claimant as required by *Black & Decker*, 538 U.S. at 830-31 and 29 U.S.C. § 1133(2). Indeed, there are many cases in which the Seventh Circuit has upheld a denial of benefits although the plan administrator did not have the claim reviewed by an independent vocational expert. *See, e.g., Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990 (7th Cir. 2004); *Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan*, 378 F.3d 669 (7th Cir. 2004).

Throughout her response to the motion for summary judgment, Migdal asserts that Matrix lacked sufficient evidence to make a reasonable determination regarding her claim for disability benefits. In support of her claim that Matrix lacked sufficient evidence, Migdal cites to *Mennenoh v. Unum Life Ins. Co. of Am.*, 302 F. Supp. 2d 982 (W.D. Wis. 2003). In *Mennenoh*, the plan administrator's decision denying the claimant's request for disability benefits was not supported by an independent medical examination or a vocational analysis. *Id.* at 988. Instead, the administrator relied on video surveillance which showed the claimant performing various physical activities that were seemingly at odds with her claimed disability. *Id.* In the instant

-11-
Case 2:05-cv-00455-JPS   Filed 10/05/06   Page 11 of 15   Document 31

case, however, the circumstances substantially differ from those in *Mennenoh*, where the only medical evidence available to the administrator was the conclusion by plaintiff's physician that she would be unable to perform for at least six months after her surgery. *Id.* Here, Matrix based its decision on several sources of medical information, including the IME conducted by Dr. Brown, the medical records of Migdal's treating physicians, and Migdal's claims file. (Crowe Aff. ¶¶ 4-7; Flynn-McBride Aff. ¶ 9; Della Costa Dep. 33.)

Migdal also claims that Matrix's inquiry did not constitute a "reasonable inquiry" because the Matrix claims administrator who reviewed Migdal's second appeal, Della Costa, did not have an education or work background in vocational assessment. Migdal claims that Matrix could "in no way expect Della Costa to make a 'reasonable inquiry' absent a requirement Della Costa seek medical and vocational consultation or expertise . . . . " (Pl.'s Resp. Br. 12.) However, as noted above, there is no requirement that a plan administrator is required to obtain independent vocational expert analysis in order to provide "a full and fair review" of a claim for disability benefits. Additionally, Della Costa did consult medical expertise in making his determination. Specifically, Della Costa consulted the IME conducted by Dr. Brown, the medical records of Migdal's treating physicians, and Migdal's claims file. (Della Costa Dep. 33.) Furthermore, the Seventh Circuit has held that the training and thought processes of those who consider a long-term disability claim is irrelevant when judicial review of a denial of long-term disability benefits is deferential. *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*,

195 F.3d 975, 981 (7th Cir. 1999) ("There should not have been any inquiry into the thought processes of UNUM's staff, the training of those who considered Perlman's claim, and in general who said what to whom within UNUM . . . ."). Thus, any allegations regarding Della Costa's education and work background are irrelevant to the question of whether Matrix's decision has "rational support in the record," *Leipzig*, 362 F.3d at 409, or whether Matrix provided "a full and fair review" of Migdal's claim for long-term disability benefits as required by *Black & Decker*, 538 U.S. at 830-31 and 29 U.S.C. § 1133(2).

Migdal criticizes Matrix for crediting Dr. Brown's IME over the opinions of Migdal's own treating physicians. However, as the Supreme Court held in *Black & Decker*, 538 U.S. at 831 "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.*; *see also Leipzig*, 362 F.3d at 409 ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)"). Thus, Migdal's assertion that Matrix was required to give her treating physicians' opinions more weight than the opinion of the independent examiner, Dr. Brown, lacks merit.

Migdal's claim that Matrix did not conduct a "reasonable inquiry" into her claim because Dr. Brown's physical examination of Migdal lasted "no more than five

minutes" (Migdal Aff. ¶ 9.) also lacks merit. Indeed, the record suggests that Dr. Brown's independent medical examination entailed substantially more than the five-minute physical exam of Migdal. Specifically, in addition to the physical exam, Dr. Brown interviewed Migdal, reviewed her medical records, and created a detailed and comprehensive 11-page report. (Flynn-McBride Aff. Ex. 2.)

Finally, Migdal criticizes Matrix for failing to determine whether there existed a conflict of interest that prevented Dr. Brown from fairly evaluating Migdal's medical condition. However, Migdal does not assert that, in fact, there existed a conflict of interest. Indeed, Dr. Brown was not employed by Aurora at the time he conducted the IME, has never performed services for Aurora as an independent contractor, and has never received payment from Aurora for services rendered in any other capacity. (Ekstrand Aff. ¶¶ 5-6.) In light of the foregoing, the court concludes that Dr. Brown's IME provides adequate basis for Matrix's conclusion.

A review of the record reveals that Migdal was afforded a reasonable opportunity for "a full and fair review" of the denial of her claim in accordance with *Black & Decker*, 538 U.S. at 830-31 and 29 U.S.C. § 1133(2). Additionally, the evidence before Matrix permitted a reasonable basis for Matrix's conclusion that Migdal was not disabled from performing any occupation. Therefore, the court concludes that Matrix's decision to deny Migdal's claim for long-term disability benefits under the "any occupation" provision of the plan has rational support in the record. Specifically, Matrix relied upon the opinion of Dr. Brown, who conducted an independent medical exam of Migdal's medical and vocational records. Additionally,

-14-
Case 2:05-cv-00455-JPS   Filed 10/05/06   Page 14 of 15   Document 31

Dr. Brown's opinion was based upon his interview with Migdal, and his own physical examination of her. In light of Dr. Brown's conclusion that "Ms. Migdal is not completely disabled from any occupation" (Flynn-McBride Aff. Ex. 2), Matrix reasonably concluded that Migdal was "not disabled from performing any occupation." (DPFOF ¶ 16; Flynn-McBride Aff. ¶¶ 8, 9; Ex. 3.) Accordingly, the court concludes that Matrix's decision was not arbitrary and capricious as a matter of law, and will grant Aurora's motion for summary judgment.

Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 11) be and the same is hereby **GRANTED** and this action be and the same is hereby **DISMISSED** with prejudice, together with costs as taxed by the clerk of the court.

The clerk of the court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this __5th__ day of October, 2006.

BY THE COURT:

s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Court